IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

UNITED STATES OF AMERICA     )
                             )     CRIMINAL ACTION NO.
     v.                      )        2:12cr187-MHT
                             )           (WO)
KAITLIN MICHELLE FERGUSON     )

OPINION

Defendant Kaitlin Michelle Ferguson pled guilty to
one count of wire fraud in violation of 18 U.S.C. § 1343.
The charge was based on Ferguson's involvement in a
scheme to secure lines of credit through unauthorized use
of the retail store Coldwater Creek's banking account.
At sentencing, Ferguson requested a downward "variance"
from the advisory 10-to-16 month term of custody
calculated pursuant to the United States Sentencing
Guidelines.  More specifically, while the government
urged the government to impose a sentence within the
guidelines range of 10-to-16 months custody, Ferguson
asked the court to sentence her to probation only.  The
court found a variance was warranted in light of, among
other things, a recent and substantial redirection from

the United States Sentencing Commission on the sentencing
of mentally ill criminal defendants. The court thus
imposed a sentence of probation with the special
condition of eight months of home confinement along with
mental-health treatment specifically tailored for
Ferguson. This opinion sets forth in detail the court's
reasons for the sentence imposed.

## I.   BACKGROUND

### A.   <u>The Offense</u>

Ferguson became involved in this criminal activity
when a neighbor approached her and asked if she would
like to obtain a credit card despite her poor credit.
When Ferguson expressed interest, the neighbor introduced
her to Connie, whose last name is not known and who in
turn introduced Ferguson to the scheme. Between 2008 and
2009, Ferguson recruited 12 other persons who, like her,
wanted to receive a credit card but would not have
otherwise been eligible. These persons gave Ferguson

2

their personal identifying information to apply for Visa credit cards on their behalf. She then gave the application information to Connie, who processed the credit-card applications, and, as part of the applications, used a payroll account from Coldwater Creek to secure lines of credit on the cards. The fraudulent credit cards were then mailed to the applicants for their own use.

B. Personal History and Mental Health

Ferguson is a 26-year-old woman with a 20-year history of mental illness. She has an Intelligence Quotient (IQ) score in the borderline-impaired range. To assist this court in understanding the relevance of her mental illness and limited cognitive abilities to her criminal conduct, Kristine Lokken, Ph.D., performed a forensic neuropsychological evaluation of Ferguson.

Dr. Lokken met with Ferguson on two occasions: August 10 and October 17, 2012. On August 10, she conducted an

3

extended clinical diagnostic interview and assessed Ferguson's psychological and intellectual abilities. On October 17, she administered academic and neurocognitive testing, had Ferguson repeat a depression questionnaire, and did a follow-up interview. In addition to these in-person evaluations, Dr. Lokken completed a thorough document review, including review of the preliminary presentence-investigation report from the United States Probation Office and medical records dating as far back as 1995. She found Ferguson's medical records and self-reported medical history were consistent.

Dr. Lokken's document review reveals that Ferguson first received psychiatric care when she was eight-years old and experiencing auditory and visual hallucinations. She had been having these hallucinations since the age of six. IQ testing was done, and Ferguson received a score of 84, putting her in the lower 14th percentile. She told her therapist at the time that she heard voices telling her to hurt herself and her sister, and she was

4

hospitalized for inpatient-psychiatric treatment. The records are silent as to how long the hospitalization lasted. She was prescribed Mellaril, an antipsychotic medication.

At 11-years old, Ferguson again appeared for mental-health treatment and again reported auditory and visual hallucinations. She was prescribed a different antipsychotic medication--Zyprexa. Her IQ was tested again, and this time she received a score of 87, ranking her in the lower 19th percentile. She was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and Psychosis, Not Otherwise Specified (NOS). The ADHD diagnosis applies to children who are frequently inattentive and/or extremely active or impulsive. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 78 (4th ed. 1994). Some of the ADHD symptoms must have been present since before the age of seven, and the symptoms must interfere with the child's ability to function at school,

work, or in social settings.  Id.  The psychosis "NOS" diagnosis indicates that the patient experiences psychotic symptoms, such as delusions, hallucinations, or disordered speech, but the psychologist could not settle on a more specific diagnosis.  Id. at 315.

Ferguson next received psychiatric treatment when she was 13.  She had stopped taking the Zyprexa and was hallucinating daily.  She saw figures standing or moving; she heard voices commanding her to hurt herself or her family; she was paranoid and depressed.  Again she was diagnosed with psychosis NOS and prescribed a new antipsychotic medication, Risperdal.  Treatment notes through Ferguson's 15th birthday show that, when she was taking her medication, she had fewer hallucinations and improved mental health, but that when family circumstances interrupted her medication regime the hallucinations returned.

For the next three years, the medical record is silent.  Her mother kicked her out of the house when she

was 15-years old; Ferguson had neither the financial resources nor the stability to continue with treatment. When she was 19, she brought herself to the Montgomery Area Mental Health Authority to request psychotherapy and medication for hallucinations. There she was diagnosed with schizoaffective disorder, and attended one additional psychotherapy session before again stopping treatment.

Ferguson told Dr. Lokken that she hallucinates on a regular basis, approximately every other day. She hears voices telling her to hurt herself, and she hears the voice of a man speaking in a language she does not understand. She sees dead relatives standing at the foot of her bed and a tall, strange man who wears all black. Dr. Lokken diagnosed her with schizoaffective disorder of the depressive type, major depressive disorder, post-traumatic stress disorder (PTSD), and marijuana abuse.

At the sentencing hearing, Dr. Lokken explained that her schizoaffective-disorder diagnosis means that

Ferguson suffers from both schizophrenia and depression and that depression features prominently.  Schizophrenia is characterized by delusions, hallucinations, disorganized speech, highly disorganized behavior, and/or flat affect.  <u>Diagnostic and Statistical Manual</u> at 274-75.  Because some depression often accompanies schizophrenia and other psychotic disorders, a person also must experience a pervasively depressed mood in order to warrant the schizoaffective-disorder diagnosis. <u>Id</u>. at 292.

Dr. Lokken explained that Ferguson's PTSD is the result of multiple childhood traumas, beginning from age three, when Ferguson's uncle shot her mother while her mother held her in her arms.  When she was seven, her uncle fought with her aunt and threw a rock through a window, striking Ferguson in the head; she was knocked unconscious for approximately 30 minutes and still has a scar on her face from the incident.  Her mother abused her, treating her worse than her younger siblings because

Ferguson had a different father and darker complexion. Ferguson remembers her mother beating her with extension cords while she was in the bathtub and that these extension-cord beatings left deep welts on her back that took a long time to heal.  Her home life was hectic, and she was often shuffled between family members.  She moved in with her aunt and uncle and, at ten-years old, she was raped in their home.  She moved back in with her mother, and, at 14, her mother's boyfriend tried to rape her, too.  After her mother put her out of the house at 15-years old, she moved in with an older, physically abusive boyfriend.  Once he punched her in the face, and she estimates she lost consciousness for about two minutes.

PTSD occurs in persons who experienced an extremely traumatic event and, following the event, re-experience the event in their day-to-day lives.  <u>Diagnostic and Statistical Manual</u> at 424.  The symptoms of PTSD include persistent anxiety and difficulty concentrating.  <u>Id</u>. at 424-25.  Based on Ferguson's history and current

9

symptoms, Dr. Lokken found ample support for the PTSD diagnosis.  At the sentencing hearing she explained to the court that trauma of the type Ferguson experienced can also predispose a person to psychotic episodes.

As for the marijuana-dependency diagnosis, Dr. Lokken found Ferguson uses marijuana as a form of self-medication to help cope with the symptoms of her mental illness.  She opined that Ferguson's marijuana-use would decrease and could cease with treatment of her mental illness.

Dr. Lokken determined Ferguson's full IQ score to be 79.  This score puts Ferguson in the eighth percentile, meaning her intellectual ability is in the borderline-impaired range.  As Dr. Lokken explained at sentencing, the borderline-impaired range falls below the low-average range and means Ferguson is intellectually impaired.  Dr. Lokken noted specific deficiencies in strategic thinking, planning, and organization and that Ferguson's mathematics ability was at a fifth-grade level.

10

In summarizing her findings in her report to the court, Dr. Lokken wrote that Ferguson has "consistently experienced psychotic features, including auditory and visual hallucinations, magical thinking, an altered sense of reality, and delusional beliefs since the age of 6." Def. Ex. 1 (Doc. No. 22) at 15. She summarized the results of the personality profile she administered as revealing a "fragile self-esteem in an individual who is vulnerable to suggestion by others" and that Ferguson "harbors an intense fear of abandonment or rejection by others, which likely motivates her to provide perceived help and assistance to others." Id.

C. <u>Procedural History</u>

Ferguson was charged with and pled guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343. The court found Ferguson to have a total-offense level of 11 and a criminal-history category of II. Thus, Ferguson had a Sentencing Guidelines range of 10-to-16 months.

11

This guidelines range put Ferguson in "Zone C," meaning that her minimum sentence would have to include some prison time--at least five months in prison and five months of home or community confinement. United States Sentencing Commission, Guidelines Manual, § 5C1.1(d) (Nov. 2012). Ferguson requested a downward variance from the guidelines range and asked the court to impose a term of probation with conditions requiring mental-health treatment and counseling. The government opposed a variance.

At the sentencing hearing, the court heard testimony from Dr. Lokken and argument from counsel on the motion for a variance. Dr. Lokken testified to Ferguson's history of mental illness and neurocognitive deficits. She told the court that, in her expert opinion, while Ferguson knew that she had done wrong and had taken something illegally, she did not have the intellectual capacity to orchestrate and commit the criminal conduct described in the presentence-investigation report; she

believes a substantial contributing factor in Ferguson's criminal behavior is her mental illness, as it makes her vulnerable, gullible, and open to coercion. She also opined that, because Ferguson's schizoaffective disorder and PTSD make her less able to handle stressors than the average person, her experience of prison would be uniquely harsh: the prison setting could worsen her depression and intensify her hallucinations.

Dr. Lokken recommended that Ferguson's punishment not involve prison. Instead, she suggested the court consider four, concrete interventions to address Ferguson's mental illness and criminality: (1) regular psychotropic medication under the supervision of a psychiatrist; (2) weekly one-hour psychotherapy sessions with a licensed clinical psychologist trained in cognitive behavioral intervention techniques; (3) concurrent substance-abuse treatment; and (4) assistance obtaining her GED and planning her career.

13

The court granted Ferguson's motion for a downward variance and varied downwards one offense level. In so doing, the court considered Ferguson's diminished capacity resulting from her schizophrenia, PTSD, depression, hallucinations, and low IQ; it also considered her diminished culpability, as evidenced by her vulnerability, susceptibility to coercion, and cognitive deficits. Lastly, the court cited Dr. Lokken's testimony that imprisonment would be detrimental to Ferguson's mental health.

With a new offense level of ten and a criminal-history category of II, the guidelines recommended a sentence of 8-to-14 months. Because this guidelines range fell in Zone B rather than Zone C, the minimum term of imprisonment could be satisfied by home confinement as a special condition of probation. Accordingly, the court imposed a sentence of four-years probation with a special condition of eight-months home confinement. As part of her probation, she must also participate in mental-health

14

and substance-abuse treatment and, with the assistance of the Probation Office, maintain compliance with her medication regime.  The court also ordered Ferguson to participate in family-planning, financial-planning, and vocational-planning programs coordinated by the Probation Office.

## II.  DISCUSSION

In determining a criminal sentence, district courts today employ a multi-step procedure: (1) calculate the sentencing range under the guidelines; (2) consider relevant policy statements from the sentencing commission, including the statements on specific-offender characteristics and grounds for departing from the sentencing range; and (3) independently evaluate the resulting sentence in view of the factors set out in 18 U.S.C. § 3553(a).  USSG § 1B1.1.  At this final step, if the court finds it necessary to impose a sentence "outside the guidelines framework," the sentence is

termed a "variance." <u>Id</u>., comment. (backg'd.). Adjustments to the sentence made at step two, on the other hand, are referred to as "departures." USSG § 1B1.1(b).

Here, the court found Ferguson's guidelines range to be 10-to-16 months. It then considered her request for a sentence of probation based on her borderline-impaired intelligence and mental illness. Because Ferguson framed this as a request for a "variance" from the guidelines, the court did not consider whether she should receive a downward departure. <u>See</u> USSG § 5K2.0. Instead, the court considered her request in light of the 18 U.S.C. § 3553(a) factors. That statute requires courts to impose a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing, which are:

> "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the

16

> defendant; and to provide the defendant
> with needed educational or vocational
> training, medical care, or other
> correctional treatment in the most
> effective manner."

18 U.S.C. § 3553(a) & (a)(2). Courts must also give weight to "the nature and circumstances of the offense," "the history and characteristics of the defendant," and "the kinds of sentences available." Id. at § 3553(a)(1) & (a)(3).

Although Ferguson requested a variance, indicating her sentence is outside the guidelines framework, the guidelines' policy statements are not only consistent with, they support, a sentence of probation in this case.

The sentencing guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." Gall v. United States, 552 U.S. 38, 46 (2007). In 2010, the Sentencing Commission amended its recommendations for sentencing mentally ill defendants in response to the Commission's "multi-year study of

17

alternatives to incarceration." USSG App. C, Vol. III at 343 (Amendment 738). As part of the study, it "reviewed federal sentencing data, public comment and testimony, recent scholarly literature, current federal and state practices, and feedback in various forms from federal judges." Id. at 343-44. The resulting amendment, Amendment 738, includes an application note that, for the first time, authorizes departure from "Zone C" of the sentencing table (which requires prison for at least half the minimum term) to "Zone B" (which does not require prison) in order to achieve a "specific treatment purpose." Id. at 343 (codified at USSG § 5C1.1, comment. (n.6)). Such a departure is appropriate in cases where the defendant "suffers from a significant mental illness, and the defendant's criminality is related to [that illness]," though courts must additionally consider the likelihood that treatment will address the defendant's mental illness as well as the risk to the public absent incarceration. Id.

Also in 2010, the Sentencing Commission amended the status of mental and emotional conditions from a specific offender characteristic that is "not ordinarily relevant" to one that "may be relevant."  USSG App. C, Vol. III at 348 (Amendment 739) (codified at USSG § 5H1.3 ("Policy Statement")).  The "specific offender characteristics" portion of the guidelines manual, Chapter Five, Part H, is the Commission's response to 28 U.S.C. § 994(d), which tasks the Commission with determining how (and whether) certain enumerated defendant characteristics are relevant to sentencing.  A specific offender characteristic identified in Chapter Five, Part H as "not ordinarily relevant" must be present to an "exceptional degree" to warrant departure.  USSG § 5K2.0(a)(4).  As amended, the specific-offender-characteristic policy statement instructs that mental and emotional conditions may be relevant in setting a lower sentence where the conditions are "present to an unusual degree" that "distinguish[es] the case from the typical cases covered by the

19

guidelines." USSG App. C, Vol. III at 348 (Amendment 739) (codified at USSG § 5H1.3); see USSG § 5K2.0(a)(1) (downward departures generally). This is a less demanding standard than the "exceptional" standard. The amendment also reiterates that a downward departure for mental or emotional conditions may be used to accomplish a specific-treatment purpose. USSG App. C, Vol. III at 348 (Amendment 739) (codified at USSG § 5H1.3) (cross-referencing USSG § 5C1.1, comment. (n.6)).

The Commission's policy statement on mental and emotional conditions compliments USSG § 5K2.13, which identifies diminished capacity as a basis for downward departure on the ground that it may not have been taken into consideration otherwise in calculating the guidelines range. USSG § 5K2.0(a)(2)(A). This provision authorizes diminished-capacity departures where "the defendant committed the offense while suffering from a significantly reduced mental capacity; and the significantly reduced mental capacity contributed

20

substantially to the commission of the offense."  USSG § 5K2.13.  It "comprehends both organic dysfunction and behavioral disturbances" so long as those conditions "impair the formation of reasoned judgments."  United States v. Cantu, 12 F.3d 1506, 1513 (9th Cir. 1993) (finding PTSD, mood disorders, and schizophrenia qualify the defendant for a diminished-capacity departure to the extent they frustrate his ability to make reasoned decisions).

Together, the amendments and policy statements reflect the principle that "punishment should be directly related to the personal culpability of the criminal defendant."  Penry v. Lynaugh, 492 U.S. 302, 319 (1989), abrogated on other grounds, Atkins v. Virginia, 536 U.S. 304, 307 (2002).  A few "exceptionally" mentally ill defendants may be found incompetent to stand trial or judged not guilty by reason of insanity; however, there also exists a spectrum of mental deficits and diseases that lessen, but do not erase, a person's responsibility

for her crimes.  <u>See</u> Jennifer S. Bard, <u>Re-Arranging Deck</u> <u>Chairs on the Titanic: Why the Incarceration of</u> <u>Individuals with Serious Mental Illness Violates Public</u> <u>Health, Ethical, and Constitutional Principles and</u> <u>Therefore Cannot Be Made Right by Piecemeal Changes to</u> <u>the Insanity Defense</u>, 5 Hous. J. Health L. & Pol'y 1, 4-5 (2005).  "[E]vidence about [a] defendant's background and character is relevant" to the sentencing decision, "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  <u>Penry</u>, 492 U.S. at 319 (quoting <u>California v. Brown</u>, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).  In addition, the traditional rationales for punishment have less force when applied to mentally ill and cognitively limited defendants.  <u>Cantu</u>, 12 F.3d at 1516; <u>United States v. Poff</u>, 926 F.2d 588, 595 (7th Cir. 1991) (en banc) (Easterbrook, J., dissenting),

cert. denied, 502 U.S. 827 (1991). "Desert (blameworthiness) loses some bite because those with reduced ability to reason, or to control their impulses, are less deserving of punishment than those who act of viciousness or greed," Cantu, 12 F.3d at 1516; "Deterrence has less value ... because people with reduced capacities are less susceptible to a system of punishment and reward." Id.; see also Bard, Re-Arranging Deck Chairs, 5 Hous. J. Health L. & Pol'y at 12-13. The remaining rationale--incapacitation to protect the public safety--does not justify incarcerating mentally ill, intellectually disabled defendants unless they are violent. Cantu, 12 F.3d at 1516; USSG §5K2.13.

The amended guidelines also reflect the growing recognition that treating mentally ill criminal defendants rather than imprisoning them better serves both the defendants and society. See, e.g., United States v. Bannister, 786 F. Supp. 2d 617, 656-67 (E.D.N.Y. 2011) (Weinstein, J.); Policy Topics: The

<u>Criminalization of People with Mental Illness</u>, National Alliance on Mental Illness, http://www.nami.org (last visited February 18, 2013); W. David Ball, <u>Mentally Ill Prisoners in the California Department of Corrections and Rehabilitation: Strategies for Improving Treatment and Reducing Recivisim</u>, 24 J. Contemp. Health L. & Pol'y 1, 34-37 (2007). Prison is not an appropriate setting for mentally ill defendants to receive treatment, as such individuals may be more vulnerable to difficult living conditions and abuse from other prisoners. Human Rights Watch, <u>Ill-Equipped: U.S. Prisons and Offenders with Mental Illness</u> 56, 59 (2003). This is because, "[f]or mentally disordered prisoners, danger lurks everywhere":

> "They tend to have great difficulty coping with the prison code--either they are intimidated by staff into snitching or they are manipulated by other prisoners into doing things that get them into deep trouble.... [M]ale and female mentally disordered prisoners are disproportionately represented among the victims of rape. Many voluntarily isolate themselves in their cells in order to avoid trouble. Prisoners who are clearly psychotic and chronically

> disturbed are called 'dings' and 'bugs'
> by other prisoners, and victimized.
> Their anti-psychotic medications slow
> their reaction times, which makes them
> more vulnerable to 'blind-siding,' an
> attack from the side or from behind by
> another prisoner."

Id. at 56-57 (quoting Terry Kupers, Prison Madness: The
Mental Health Crisis Behind Bars and What We Must Do
About It 20 (1999)).  Providing comprehensive, effective
treatment for those mentally ill defendants whose
disorder drives their criminality will more likely
protect the public from suffering future crime--and that
treatment does not come from incarceration.

In sum, while the 2010 amendments apply most clearly
in the context of "departures" from the guidelines range,
the court sees no reason why their teachings on the
relevance of mental illness should not extend to
"variances" under 18 U.S.C. § 3553(a).  Following the
guidelines' re-assessment of the relevance of mental and
emotional conditions, these characteristics need no
longer be present to "an exceptional degree" to warrant

25

consideration at sentencing.  Moreover, the amendments demonstrate that, where mental illness or cognitive deficits are a contributing factor greatly or even only limitedly in a crime, such defendants are more likely less-deserving of punishment for punishment's sake than are those without such limitations.  Finally, the amendments indicate that prison may not be the appropriate setting for mental-health treatment and that the importance of effective treatment can justify adjustment of the guidelines range.  Indeed, it can now be reasonably argued that, in fashioning an appropriate sentence, courts are now required to consider, and factor in, a defendant's mental illness if they are to be faithful to § 3553(a).

In this case, Dr. Lokken explained to the court that, while Ferguson knew that what she was doing was wrong, her borderline-impaired intellectual capacity made it nearly impossible for her to orchestrate the elaborate wire-fraud scheme or even to understand the scheme in any

26

detail.  Dr. Lokken also described how schizoaffective disorder, PTSD, and neurocognitive limitations left Ferguson particularly vulnerable to the manipulation and coercion of more sophisticated criminal actors.  Her evaluation was critical in helping the court appreciate the link between Ferguson's mental disorders and criminal conduct.

The forensic report served yet another purpose in this case: advising the court on appropriate mental-health interventions.  Dr. Lokken explained that, for a person suffering from hallucinations, major depression, and PTSD, the stressors inherent in a prison setting would frustrate the goal of treatment.  And she offered concrete steps for addressing Ferguson's mental illness and criminality outside of prison--steps which this court largely followed in setting special conditions of probation.

In light of Dr. Lokken's evaluation and the court's own review of Ferguson's medical record, the court

**27**

concluded that untreated mental illness and borderline-impaired IQ were related to Ferguson's involvement in this wire-fraud scheme.  The court also concluded that treatment of Ferguson's mental illness is a worthy and attainable goal.  As such, and in accordance with the policy directives of the sentencing guidelines, the court decided to vary downwards one level for the specific purpose of allowing Ferguson to receive mental-health treatment outside of prison, a course that will not only benefit Ferguson but will also better promote public safety and well-being.

***

In conclusion, for the above reasons, the court believed that the sentence Ferguson received met all the requirements of 18 U.S.C. § 3553(a) and was reasonable.

DONE, this the 20th day of February, 2013.

                              /s/ Myron H. Thompson
                         UNITED STATES DISTRICT JUDGE